# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
CIGAR ASSOCIATION OF AMERICA, et al., )
)
    Plaintiffs, )
)
        v. )     **Case No. 1:16-cv-1460 (APM)**
)
U.S. FOOD AND DRUG )
ADMINISTRATION, et al., )
)
    Defendants. )
_____ )

## <u>MEMORANDUM OPINION</u>

## I.    INTRODUCTION

Six public health organizations (the "Proposed Intervenors") seek to intervene in this case to defend regulations issued by the U.S. Food and Drug Administration that subject cigars, pipe tobacco, and other tobacco products to the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 et seq., as amended by the Family Smoking Prevention and Tobacco Control Act, Pub. L. No. 111–31, 123 Stat. 1777 (2009) ("Tobacco Control Act").  Plaintiffs, associations that represent cigar manufacturers, retailers, and importers, challenge the FDA's (1) adoption of warning label requirements for cigar and pipe tobacco products; (2) imposition of user fees on cigar and pipe tobacco products but not e-cigarettes; (3) treatment of retailers who blend pipe tobacco as "tobacco product manufacturers"; and (4) classification of pipes as "components" of tobacco products.  Of those challenges, Proposed Intervenors' motion to intervene is predicated primarily on Plaintiffs' first challenge—the new warning requirements for cigar and pipe tobacco products.  Proposed Intervenors contend that, if Plaintiffs are successful, then they will be forced to spend resources educating the public about the risks of tobacco use that otherwise would be conveyed by the

warnings themselves. That additional expenditure of resources, they believe, establishes the injury-in-fact necessary to demonstrate Article III standing and constitutes the legal interest required to intervene as of right under Rule 24(a) of the Federal Rules of Civil Procedure.

Upon careful consideration of the briefs and the record, the court concludes that Proposed Intervenors have not established that they would suffer a legally sufficient injury-in-fact if Plaintiffs were to prevail in this litigation. Therefore, they lack standing to intervene as of right, and the court declines to allow Proposed Intervenors to intervene permissively. Accordingly, the court denies Proposed Intervenors' Motion to Intervene.

## II. BACKGROUND

### A. Plaintiffs' Challenge to the Rule

In 2009, Congress passed the Family Smoking Prevention and Tobacco Control Act ("Tobacco Control Act"), which granted the U.S. Food and Drug Administration the authority to regulate cigarettes and other tobacco products. *See* 21 U.S.C. § 387a. Congress immediately applied the Act to "all cigarettes, cigarette tobacco, roll-your-own tobacco, and smokeless tobacco" ("Originally Regulated Products"). *Id.* § 387a(b). Congress left it to the FDA to decide whether to apply the Act to other types of tobacco products. Specifically, it vested in the FDA the authority to "deem[ ]" "any other tobacco product[ ]" subject to the Act. *Id.*

In May 2016, the FDA exercised its "deeming" muscle. It published a Final Rule ("Rule") designating cigars, pipe tobacco, and certain other tobacco products (e.g., e-cigarettes) as "other tobacco products" subject to the Tobacco Control Act. *See Deeming Tobacco Products To Be Subject to the Federal Food, Drug, and Cosmetic Act, as Amended by the Family Smoking Prevention and Tobacco Control Act; Restrictions on the Sale and Distribution of Tobacco Products and Required Warning Statements for Tobacco Products*, 81 Fed. Reg. 28,973 (May 10,

2016) (to be codified at 21 C.F.R. pts. 1100, 1140, 1143).[1]  The FDA's action made cigars and pipe tobacco subject to requirements currently in place for Originally Regulated Products, such as pre-market review, a prohibition on the sale of products with descriptors such as "light" and "mild," and ingredient reporting.  *Id.*  And, critically, for present purposes, the Rule included comprehensive warning requirements for cigar and pipe tobacco packaging and advertising.  81 Fed. Reg. at 28,974.  That provision mandates that cigar manufacturers, distributors, importers, and retailers include one of six health warnings on cigar and pipe tobacco packages and in cigar and pipe tobacco advertisements, as well as rotate those six warnings in a manner that ensures consumers see all six.  81 Fed. Reg. at 29,060–29,062.  The provision also sets font size, location, and other requirements for displaying the warnings and mandates the submission of warning plans. *Id.*

Plaintiffs—three associations that represent cigar manufacturers, importers, distributors, retail shops, suppliers, and consumers—filed suit in July 2016 to challenge the Rule in multiple respects as unlawful under the Tobacco Control Act, the Administrative Procedure Act (the "APA"), and the First and Fifth Amendments to the United States Constitution.  Compl., ECF No. 1 [hereinafter Compl.], ¶¶ 4–5.  Though filed more than a year ago, this suit has barely gotten off the ground.  Following Defendants'[2] answering of the Complaint and Plaintiffs' filing of an initial motion for summary judgment, the change in presidential administrations caused the parties to seek multiple extensions of the briefing schedule "to allow new leadership personnel at the

---

[1] Plaintiffs also challenge the User Fee Rule, under which the FDA plans to collect fees from domestic manufacturers and importers of cigars and pipe tobacco.  Under the Federal Food, Drug, and Cosmetic Act, FDA has the authority to assess and collect fees from domestic manufacturers and importers of tobacco products in order to fund its regulation of tobacco products. *Requirements for the Submission of Data Needed to Calculate User Fees for Domestic Manufacturers and Importers of Cigars and Pipe Tobacco*, 81 Fed. Reg. 28,707, 28,707 (May 10, 2016).  Proposed Intervenors do not take a position on that issue.  Mot. to Intervene, ECF No. 36, at 6 n.6.

[2] Plaintiffs named as defendants the FDA, the U.S. Department of Health and Human Services, Sylvia Mathews Burwell, in her official capacity as Secretary of Health and Human Services, and Robert Califf, in his official capacity as Commissioner of Food and Drugs.  The court refers to them collectively as Defendants.

Department of Health and Human Services to more fully consider the issues raised in this case and determine how best to proceed." Joint Mot. to Amend Scheduling Order, ECF No. 27; Joint Mot. to Amend Scheduling Order, ECF No. 34. The parties hoped that the extensions of time would enable them to resolve the pending disputes or, at least, narrow the issues.

The additional time proved to be partially successful from Plaintiffs' perspective. On July 28, 2017, the FDA announced a "new comprehensive plan" for regulating tobacco products that delayed implementation of the Rule in several important respects. Pls.' Opp'n to Mot. to Intervene, ECF No. 44 [hereinafter Pls.' Opp'n], Ex. A, ECF No. 44-1 [hereinafter Pls.' Opp'n, Ex. A]. The FDA extended to August 8, 2021, the deadline for tobacco manufacturers to submit applications for newly regulated products, including cigars and pipe tobacco, that were on the market as of August 8, 2016, and provided that manufacturers could continue to market those products while the applications were pending. Pls.' Opp'n, Ex. A at 2; Joint Status Report, ECF No. 51, ¶ 3. The FDA also announced that it would seek public comment on (1) the role that flavors in tobacco products play in attracting youth and (2) the patterns of use and resulting public health impacts of premium cigars, thereby suggesting that future rulemaking may result in the Rule's amendment. Joint Status Report, ECF No. 51, ¶ 3. The FDA otherwise left the Rule intact, including its comprehensive warning requirements for cigars and pipe tobacco.

In response to the "new comprehensive plan," Plaintiffs limited the number of claims presented. Plaintiffs identified six claims as the ones they wished to pursue at this time.[3] *Id.* ¶ 5. On October 3, 2017, Plaintiffs moved for summary judgment as to those claims and sought order enjoining the warning requirements. Pls.' Mot. for Prelim. Inj., ECF No. 61; Pls.' Mot. for Partial

---

[3] The remaining three claims are held in abeyance pending the outcome of the FDA's review described above.

Summ. J., ECF No. 62 [hereinafter Pls.' Mot. for Partial Summ. J.], at 2–4. Defendants' opposition brief is due on October 24, 2017. *See* Order, Sept. 19, 2017, ECF No. 57.

### B.     The Proposed Intervention

The Proposed Intervenors—the American Academy of Pediatrics, the American Cancer Society Cancer Action Network, the American Heart Association, the American Lung Association, the Campaign for Tobacco-Free Kids, and the Truth Initiative—are six public health organizations that seek to defend the Rule against Plaintiffs' challenges. The court granted the Proposed Intervenors' initial request to participate in this matter as amici. Order, Apr. 3, 2017, ECF No. 30. On July 24, 2017, however, the Proposed Intervenors sought to upgrade their status to that of parties and filed a Motion to Intervene as defendants (the "Motion"), citing "recent indications that Defendants may not aggressively defend the [Rule], or may seek to alter or rescind the Rule." Mot. to Intervene, ECF No. 36 [hereinafter Mot. to Intervene], at 3.

In light of the parties' then-ongoing discussions about the scope of their disputes, the court deferred ruling on Proposed Intervenors' Motion until Plaintiffs identified the claims that they presently wish to litigate. Order, Aug. 18, 2017, ECF No. 49. On September 5, 2017, Plaintiffs made known the narrowed set of claims that are now before the court. Joint Status Report, ECF No. 51. The parties and Proposed Intervenors then supplemented their intervention papers. *See* Suppl. Mem. in Supp., ECF No. 54; Defs.' Supp. Resp. to Mot. to Intervene, ECF No. 58; Proposed Intervenors' Suppl. Br. in Supp. [hereinafter Suppl. Br. in Supp.], ECF No. 59; Pls.' Suppl. Br. in Opp'n, ECF No. 60. Therefore, Proposed Intervenors' Motion is now ripe for consideration.

## III. DISCUSSION

### A. Proposed Intervenors' Primary Interest in the Claims Presently Before the Court

Before turning to the merits of the Motion, the court places Proposed Intervenors' intervention request in the context of the claims that are presently before it. This context informs the court's analysis.

As discussed, of their nine original claims, Plaintiffs presently move for summary judgment as to six. The six claims are as follows: (1) the Rule's imposition of user fees on domestic manufacturers and importers of cigars to fund FDA's regulation of tobacco products violates the APA (Count II) and the Fifth Amendment (Count III); (2) the Rule's warning requirements violate the First Amendment (Count VII), the APA (Count VI), and the Tobacco Control Act; (3) the Rule's treatment of retailers who blend pipe tobacco as "manufacturers" violates the APA (Count VIII); and (4) the Rule's classification of pipes as "components" of a tobacco product subject to regulation, rather than accessories not subject to regulation, violates the APA (Count IX). Compl. at 28–37; Pls.' Mot. for Partial Summ. J. at 2–4. In their original moving papers, Proposed Intervenors stated that they intended to take no position with respect to the user-fee issue. Mot. to Intervene at 6 n.6. In addition, through their silence, Proposed Intervenors implicitly have advanced no interest in the claims concerning the classification of retailers who blend pipe tobacco as "manufacturers" or the treatment of pipes as "components" of a tobacco product. Neither Proposed Intervenors' original motion nor its supplemental briefing state any interest in, or intention to defend the Rule as to, those two issues. *See, e.g. id.* at 13–14, 17 (asserting standing and a legal interest based on the "availability of unregulated cigars"); Suppl.

Br. in Supp. at 2 (identifying only Plaintiffs' challenge to the warning requirements as implicating Proposed Intervenors' interests).

In short, Proposed Intervenors' advance just one interest in defending the Rule against Plaintiffs' present set of claims—preserving the Rule's warning requirements. With that interest in mind, the court now turns to the merits of Proposed Intervenors' Motion.

Proposed Intervenors seek to intervene as defendants as of right under Rule 24(a)(2) of the Federal Rules of Civil Procedure or, alternatively, with the court's permission under Rule 24(b)(1). The court first considers intervention as of right under Rule 24(a)(2) before turning to permissive intervention.

## B.      The Court Denies Intervention As of Right

In the D.C. Circuit, a person seeking to intervene as of right under Rule 24(a) must demonstrate:  (1) that the application to intervene is timely; (2) the party has a legally protected interest in the action; (3) the action threatens to impair that interest; and (4) no party to the action can adequately represent that interest.  *Deutsche Bank Nat'l Trust Co. v. FDIC*, 717 F.3d 189, 192–93 (D.C. Cir. 2013) (citing FED. R. CIV. P. 24(a)).  In addition to satisfying those factors, a person seeking to intervene under Rule 24(a) must demonstrate Article III standing.  *See id.* at 193. Standing is required regardless of whether the person asks to intervene as a plaintiff or defendant. *Id.*

As standing is a threshold inquiry, the court starts with that requirement.  Putative intervenors must satisfy the traditional three elements of Article III standing:  (1) an actual or threatened injury-in-fact, "(2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. ___, ___, 136 S. Ct. 1540, 1547 (2016).  An injury-in-fact is "an invasion of a legally

protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (footnote, citations, and internal quotation marks omitted). Where, as here, standing is "premised on future injury, [the party] must demonstrate a realistic danger of sustaining a direct injury." *Arpaio v. Obama*, 797 F.3d 11, 21 (D.C. Cir. 2015) (internal quotation marks omitted). Because Proposed Intervenors seek to enter this case at the summary judgment stage, they must support each element of standing by affidavit or other evidence. *See Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015). Proffered facts must be sufficiently specific to rise above the level of "conclusory allegations," and the court will not presume missing facts needed to establish an element of standing. *See id.* Accordingly, at this stage, it is not sufficient for Proposed Intervenors simply to allege injury.

Proposed Intervenors offer two theories of standing. First, each Proposed Intervenor contends that it has "organizational standing" to intervene. Second, Proposed Intervenors assert that one of them, the American Academy of Pediatrics, has "associational standing" because its individual members would have standing under Article III to sue in their own right. Mot. to Intervene at 12–15. The court addresses each theory in turn.

a.     Organizational Standing

To establish that it has suffered a concrete and demonstrable injury in its own right, an organization must satisfy two criteria. A court must ask "first, whether the agency's action or omission to act injured the organization's interest and, second, whether the organization used its resources to counteract that harm." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) (alteration adopted).[4] To satisfy these elements, "an organization must allege that the

_____

[4] Judges in this District recently have remarked on the ambiguity in the case law concerning organizational standing, and the court refers the reader to the excellent summaries of its colleagues. *See Cmty. Fin. Servs. Ass'n of Am., Ltd.*

defendant's conduct perceptibly impaired the organization's ability to provide services." *Id.* (internal quotation marks omitted). A defendant's actions do not "perceptibly impair" an organization's ability to provide services if an organization merely uses resources for litigation, investigation in anticipation of litigation, or advocacy. *Id.* Neither does an organization's use of resources "to educate its members and others" "perceptibly impair" the organization's activities, "unless doing so subjects the organization to operational costs beyond those normally expended." *Id.* at 920 (internal quotation marks omitted). Instead, to show an injury to its interests, the organization must show that the defendant's conduct caused "an inhibition of the organization's daily operations." *Id.* at 919 (internal quotation marks omitted and alteration adopted).

The facts in *Food & Water Watch* are instructive of what constitutes an injury sufficient for organizational standing. In that case, a consumer group challenged new USDA poultry inspection regulations that shifted responsibility for inspection tasks from federal inspectors to industry personnel. 808 F.3d at 910–11. The group alleged that this change would cause an increased risk of consumers contracting foodborne illness from poultry. *Id.* at 914. In support of its assertion of organizational standing, the group urged that the agency's action would force it to spend resources to educate the public that a USDA inspection sticker does not mean a product is safe, as well as to encourage its members to avoid poultry products from companies not using federal inspectors. *Id.* at 920. The Circuit held that these injuries were insufficient to support organizational standing. *Id.* Describing the group's alleged injury to be "nothing more than an abstract injury to its interests," the Circuit explained that the group had failed to establish that its

---

*v. FDIC*, 2016 WL 7376847, at *11 (D.D.C. Dec. 19, 2016); *New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 164–66 (D.D.C. 2016); *Int'l Acad. of Oral Med. & Toxicology v. FDA*, 195 F. Supp. 3d 243, 254–56 (D.D.C. 2016). For present purposes, this court follows the D.C. Circuit's precedent in *Food & Water Watch, Inc. v. Vilsack*, which sets out a two-part test for evaluating whether an organization has suffered an injury-in-fact requisite for Article III standing.

"activities have been perceptibly impaired in any way." *Id.* at 920–21. The panel, therefore, found the group did not have standing to challenge the USDA's new regulations. *Id.* at 921.

Also helpful to the present case is the *Food & Water Watch* Court's comparison of a case where it did find organizational standing. *Id.* In *People for the Ethical Treatment of Animals (PETA) v. USDA*, PETA claimed the USDA had violated the law by failing to apply the Animal Welfare Act to birds and, therefore, the agency was not generating inspection reports PETA used to educate its members. 797 F.3d 1087, 1094 (D.C. Cir. 2015). Furthermore, because the USDA did not collect information about bird mistreatment, PETA claimed it lacked the investigatory information it needed to bring statutory violations to the agency's attention and prevent bird cruelty. *Id.* at 1091, 1094. The Circuit held that the group's two claimed harms—the denial of (1) information and (2) a way to seek redress for bird abuse—sufficed to establish a cognizable injury. *Id.* at 1095. *Food & Water Watch* and *PETA* therefore provide helpful guideposts in assessing when an organization has incurred a sufficient injury to establish standing on its own behalf.

Each Proposed Intervenor has submitted an affidavit discussing the organizational harm it faces if the court strikes down the Rule. Recognizing that injury sufficient to support standing for one is sufficient to support standing for all, *see Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998) ("Because [one intervenor-applicant] has standing, we need not determine whether the other intervenor-applicants . . . also have standing."), the court summarizes the evidence presented by each Proposed Intervenor to determine whether any one has established an injury-in-fact, which would be sufficient to provide all Proposed Intervenors with standing.

- The American Academy of Pediatrics ("AAP") is a membership organization of pediatricians and pediatric specialists that aims to advance the health of infants, children, adolescents, and young adults, and it expends resources to provide its

physician members with tools to screen their patients for tobacco use and counsel their patients against such use. Mot. to Intervene, Ex. 3, ECF No. 36-3 [hereinafter Del Monte Aff.], ¶¶ 6, 8. AAP's declarant asserts that vacating the Rule "would make it more difficult for AAP to effectuate its policies and would require the expenditure of additional resources" and force AAP "to expend more resources to assist its members in educating youth." *Id.* ¶¶ 8, 15.

- Campaign for Tobacco-Free Kids ("TFK") is a nonprofit organization that educates the public about the dangers of tobacco and develops policies and activities to prevent kids from using tobacco and to encourage users to quit. Mot. to Intervene, Ex. 4, ECF No. 36-4 [hereinafter Myers Aff.], ¶ 3. TFK argues that if Plaintiffs obtain their requested relief, it "would face additional obstacles and would have to expend more resources to achieve the objectives of its public education and youth activities." *Id.* ¶ 13.

- The American Cancer Society Cancer Action Network ("ACS CAN") is a nonprofit organization with 47,000 members nationwide. Mot. to Intervene, Ex. 5, ECF No. 36-5 [hereinafter Phillips Aff.], ¶¶ 3–5. It educates the public about the dangers of tobacco products, supports policies and programs that discourage tobacco use and encourage quitting, and advocates for tobacco regulation. *Id.* ¶ 5. ACS CAN's representative claims that invalidating the Rule would make it more difficult for its public education and youth activities to be effective, and argues that, if Plaintiffs receive the relief they seek, ACS CAN "would face additional obstacles and would have to expend more resources to achieve the objectives of its public education and youth activities." *Id.* ¶ 12.

- The American Heart Association ("AHA") is a nonprofit organization that provides education and counseling to prevent youth initiation of tobacco use and to encourage tobacco users to quit. Mot. to Intervene, Ex. 6, ECF No. 36-6 [hereinafter Schoeberl Aff.], ¶¶ 3–4. AHA's declarant asserts that striking down the Rule would "make it more difficult for AHA to effectuate its policies and would require the expenditure of additional resources." *Id.* ¶ 9. The declarant argues that the relief sought by Plaintiffs "would make it more difficult for AHA's public education and youth activities to be effective." *Id.* ¶ 16.

- The Truth Initiative Foundation ("Truth Initiative") is a tax-exempt corporation that conducts research and sponsors programs to educate young people about tobacco and help smokers quit smoking. Mot. to Intervene, Ex. 7, ECF No. 36-7 [hereinafter Vargyas Aff.], ¶¶ 6–9. Truth Initiative's affiant states that the organization's "programs and its ability to achieve its corporate purposes would be directly harmed if the deeming regulation's applicability to all cigars . . . were to be limited in any fashion." *Id.* ¶ 13. The affiant continues, "Truth Initiative would either have to spend more funds and devote additional other resources to educate youth, young adults[,] and adults about the fact that all cigars pose substantial health risks and are, in fact, no safer than cigarettes, or, alternatively, forego providing life-saving information." *Id.*

- The American Lung Association ("ALA") is a nonprofit organization that provides assistance to tobacco users who are trying to quit as part of its mission to promote lung health, prevent lung disease, and educate the public about the consequences of cigar smoking. Mot. to Intervene, Ex. 8, ECF No. 36-8 [hereinafter Wimmer Aff.],

¶¶ 3–6. The ALA's affiant asserts that invalidating the Rule with respect to cigars would "make it more difficult to effectuate its policies and would require the expenditure of additional resources." *Id.* ¶ 7. The affiant continues, "The relief plaintiffs seek would undermine the effectiveness of ALA's sponsorship of activities . . . to educate people about the dangers of using cigars and would require ALA to expend more of its resources in order to accomplish its purposes." *Id.* ¶ 10. Further, the affiant states, "If plaintiffs obtain the relief they seek ALA would face additional obstacles and would have to expend more resources to achieve the objectives of its public education and youth activities." *Id.* ¶ 12.

Collectively, Proposed Intervenors assert that, if Plaintiffs were to succeed in their challenges to the Rule, such a result would reduce the effectiveness of their anti-tobacco efforts and cause them to expend additional resources to meet their objectives. Now, specifically with regard to Plaintiffs' challenge to the warning requirements, Proposed Intervenors argue that they "have a direct interest in these requirements because the purpose of warnings is to educate smokers and potential smokers about the risk of smoking and thus to deter smoking." Suppl. Br. in Supp. at 3. "Absent warnings," they continue, "Intervenors would be compelled to expend additional resources to communicate information to the public that would otherwise appear on the products themselves." *Id.* That additional expenditure of resources, they claim, is sufficient injury to establish Article III standing. *Id.*

Although each Proposed Intervenor advances a laudable organizational goal, no Proposed Intervenor has demonstrated that its activities will be "perceptibly impaired" as required to make out a concrete and demonstrable injury for purposes of Article III. Each organization does no more than assert that it will have to expend some undefined amount of additional resources if the Rule

is vacated. Such a generalized harm, as the D.C. Circuit held in *Food & Water Watch*, amounts to "no more than an abstract injury to its interests." 808 F.3d at 920. Not one of the Proposed Intervenors has come forward with evidence showing that invalidating the Rule would inhibit the organization's daily operations. Nor has any Proposed Intervenor demonstrated that it would incur "operational costs beyond those normally expended" to educate the public about the risks of tobacco if the Rule were to be stricken. Proposed Intervenors' offer of proof fares no better when the court focuses only on the warning requirements. Proposed Intervenors offer no new evidence with their supplemental brief that focuses on the harm that would arise from invaliding the warning requirements. Indeed, the only evidence that Proposed Intervenors cite in their supplemental brief is a generic statement from TFK's affiant that the relief sought by Plaintiff would require TFK to "expend more resources to achieve the objectives of its public education and youth activities." Suppl. Br. in Supp. at 3 (quoting Myers Aff. ¶ 13). That is not enough to establish injury. *See Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429 (stating that "[f]rustration of an organization's objectives is the type of abstract concern that does not impart standing" (internal quotation marks omitted)); *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 9, 11, 12 (D.C. Cir. 2011) (holding that spending time and monetary resources to clarify jurisdiction of Clean Water Act did not suffice to show injury-in-fact); *Ams. for Safe Access v. DEA*, 706 F.3d 438, 458 (D.C. Cir. 2013) (holding that spending money to educate the public and engage in advocacy is insufficient to support organizational standing).

In support of their assertion of standing, Proposed Intervenors point to a single line from the D.C. Circuit's recent decision in *Crossroads Grassroots Policy Strategies v. FEC*, but that line cannot bear the weight they place upon it. *See* Mot. to Intervene at 11; Suppl. Br. in Supp. at 2. In *Crossroads*, the Circuit stated that a party suffers "a sufficient injury in fact where a party

benefits from agency action, the action is then challenged in court, and an unfavorable decision would remove the party's benefit." *Crossroads*, 788 F.3d 312, 317 (D.C. Cir. 2015). While the court does not doubt that Proposed Intervenors' organizational objectives would be furthered by the Rule's implementation, furthering an institutional goal is not the type of "benefit" that the court had in mind in *Crossroads*. There, the advocacy group Public Citizen challenged a Federal Election Commission ruling in favor of Crossroads, and Crossroads moved to intervene as a defendant, seeking to defend the agency's ruling. *Id.* at 314–15. The court allowed Crossroads to intervene, not merely because Crossroads stood to gain a legal benefit if the ruling remained intact, but because Crossroads would be subject to enforcement proceedings by a federal agency if the ruling was overturned. *Id.* at 318. Such a loss of a beneficial agency action, the court held, constituted a concrete injury. *Id.* Here, Proposed Intervenors neither received the type of benefit that Public Citizen received in *Crossroads* nor face the kind of risk that Public Citizen faced from the reversal of agency action. Proposed Intervenors, at most, have shown that the Rule will help them achieve their organizational objectives and that the Rule's demise would make it harder to achieve those objections. *Crossroads* does not support a finding that such a showing alone confers standing.

Proposed Intervenors further suggest that they have standing because the D.C. Circuit has found that certain of the Proposed Intervenors had standing in other matters concerning tobacco regulation. Mot. to Intervene at 12. The two cases that Proposed Intervenors cite are inapposite. In both *United States v. Philip Morris USA, Inc.* and *Public Citizen v. FTC*, particular public health organizations were permitted to intervene because the Circuit held that they had established *associational* standing on behalf of their members. *United States v. Philip Morris*, 566 F.3d 1095, 1098 (D.C. Cir. 2009); *Public Citizen v. FTC*, 869 F.2d 1541, 1553 (D.C. Cir. 1989). In this case,

only the American Academy of Pediatrics asserts associational standing, which the court addresses in the next section. The D.C. Circuit's past acceptance of certain of the Proposed Intervenors on the basis of associational standing has no bearing on whether Proposed Intervenors have organizational standing in this case.

Accordingly, Proposed Intervenors have failed to allege a sufficient injury-in-fact to support organizational standing and are not entitled to intervene as of right on that theory.

b.    Associational Standing

The Proposed Intervenors also maintain that they have standing because one of them—the American Academy of Pediatrics ("AAP")—has associational standing; that is, standing to intervene on behalf of its physician members. Mot. to Intervene at 14. If AAP has associational standing to intervene, then standing is not an impediment for any of the Proposed Intervenors. *See Military Toxics Project*, 146 F.3d at 954.

To establish associational standing, an organization must demonstrate: (1) that at least one member would have Article III standing in his or her own right; (2) "that the interests it seeks to protect are germane to its purposes"; and (3) "neither the claim asserted nor the relief requested requires an individual member participate in the lawsuit." *Nat. Res. Def. Council v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007); *see Hunt v. Wash. Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).

Proposed Intervenors offer an affidavit from Mark Del Monte, AAP's chief deputy and senior vice president for advocacy and external affairs, as evidence in support of AAP's associational standing. Del Monte states that AAP is a membership organization of 66,000 pediatricians and pediatric specialists. Del Monte Aff. ¶ 3. He attests that AAP's pediatrician

members "actively screen their patients for use of tobacco and provide counseling to their patients and patients' parents about the health hazards of tobacco use." *Id.* ¶ 6. He further states:

> AAP expends substantial resources in providing its physician members tools to screen their patients for use of tobacco products and counsel their patients and patients' parents against use of tobacco products. . . . The presence of unregulated tobacco products undermines these efforts by increasing the opportunities for young people to begin or continue using tobacco products. Invalidation of [the Rule] with regard to cigars would therefore make it more difficult for AAP to effectuate its policies and would require the expenditure of additional resources. *The individual physician members of AAP would suffer similar harm from the invalidation of the rule.*
>
> . . . .
>
> By preserving the availability of flavored cigars and other products that particularly appeal to youth, the relief plaintiffs request would increase the likelihood that young people would begin and continue smoking. This would make it more difficult for AAP's members to be effective in (a) giving young people an accurate understanding of the dangers of cigar smoking; (b) discouraging initiation of cigar smoking by young people; and (c) encouraging cigar smokers, particularly young people, to quit. If plaintiffs obtain the relief they seek AAP would face additional obstacles and would have to expend more resources to assist its members in educating youth than it would have if the considerable public health benefits of [the Rule] were left in place.

*Id.* ¶¶ 8, 15 (emphasis added). Based on these statements, Proposed Intervenors assert that, if Plaintiffs' challenge succeeds, AAP's members would be injured, and thus have standing to intervene, because they would be required to "spend more time counseling patients and their parents not to smoke[,]" in the absence of the Rule. Mot. to Intervene at 14. They add:

> [V]acatur of the rule would directly undermine the interests of Public Health Intervenors. For example, every child who takes up smoking is a child whom AAP's pediatrician members must spend additional time counseling and treating—which means, among other things, a doctor can see fewer patients (to say nothing of the impact on the health of the child).

Reply in Supp., ECF No. 46, at 10.  In short, Proposed Intervenors' argument for associational standing is the same as that advanced to support organizational standing—that AAP's members would have to expend additional time and resources counseling patients about the dangers of tobacco use if Plaintiffs are successful in vacating the Rule.

In *Rainbow/PUSH Coalition v. FCC*, the D.C. Circuit was presented with an argument similar to the one Proposed Intervenors make here to support associational standing.  396 F.3d 1235 (D.C. Cir. 2005).  In that case, an organization that worked against racial discrimination in employment challenged two decisions of the Federal Communications Commission to grant license renewal applications to a radio station in St. Louis, Missouri, that had been accused of discriminatory employment practices.  *Id.* at 1237.  To support associational standing, the organization submitted an affidavit from one of its members in the St. Louis area who was both a regular listener of the radio station and an employment counselor for the organization.  *Id.* at 1240. The counselor identified, as his injury, the burdens associated with "keep[ing] track of which company discriminates and which doesn't" and "counsel[ing] young people on how to deal with discrimination when they encounter it."  *Id.* at 1241.  He also stated that if major institutions, such as public radio stations, "were to stop discriminating overnight, an enormous burden . . . would be lifted from [his] shoulders."  *Id.* at 1242.  The Circuit found this affidavit insufficient to establish associational standing.  *Id.* at 1239–42.  The Circuit held that the counselor's first asserted injury— the burdens associated with tracking discrimination and counseling young people about discrimination—was not sufficient to establish associational standing because he did not say that discrimination at the station frustrates his efforts or would cause him to expend resources to counteract discrimination at the station.  *Id.* at 1241.  The Circuit noted that the counselor's declaration did not even mention the radio station.  *Id.*  As to his second alleged injury—that the

cessation of discrimination by the radio station would lift an "enormous burden"—the Circuit held

that it too was insufficient to support standing because the counselor failed to identify how the end

of discrimination at this particular radio station would "perceptibly affect his activities." *Id.* at

1242. The Circuit therefore concluded that the counselor's affidavit failed to support associational

standing for the organization.

The affidavit submitted by AAP in this case suffers from similar infirmities. Del Monte's

affidavit, at most, conveys AAP's physicians' abstract societal interest in combating tobacco use

among children, and fails to connect that interest to Plaintiffs' present challenges to the Rule.

*Cf. id.* at 1241. Del Monte states that "the presence of unregulated tobacco products . . . would

require the expenditure of additional resources," and, more specifically, the "availability of

flavored cigars and other products" would make it more difficult for AAP's members to counsel

young people about the dangers of smoking. Del Monte Aff. ¶¶ 8, 15. Those purported injuries,

however, are neither particularized nor concrete. Del Monte makes no mention of any specific

aspect of the Rule that is presently at issue. Indeed, he says not a word about the warning

requirements or how the absence of such warnings would impact AAP's members. True, Del

Monte alludes to an increase of expenditures from the existence of "unregulated tobacco products"

in the market, but this generic statement falls short of establishing a connection between the

challenged parts of the Rule and its members' activities being "perceptibly impaired." Proposed

Intervenors have not, for example, provided the court a clear picture of how the absence of health

warning requirements mandated by the Rule will affect their members' relationships with patients

or their allocation of resources to combat youth tobacco usage. AAP's vague assertion of injury

to its members fails at this stage of the case, where its asserted injury must rise above the level of

"conclusory allegations." *See Swanson Grp. Mfg.*, 790 F.3d at 240.

For these reasons, Proposed Intervenors fail to establish an injury sufficient to support associational standing.

*      *      *

Due to Proposed Intervenors' failure to allege a cognizable injury to the organizations themselves or to any member of AAP, they have not carried their burden to establish organizational standing or associational standing and, therefore, cannot intervene as of right under Rule 24(a). In light of this conclusion, the court need not consider the specific factors under Rule 24(a).

### C.     The Court Declines to Allow Permissive Intervention

Although the absence of standing dooms Proposed Intervenors' request to intervene as of right, that deficiency does not necessarily command the same result for their request to intervene permissively under Rule 24(b). "It remains . . . an open question in this circuit whether Article III standing is required for permissive intervention." *Defs. of Wildlife & Sierra Club v. Perciasepe*, 714 F.3d 1317, 1327 (D.C. Cir. 2013); *cf. Deutsche Bank Nat'l Trust Co.*, 717 F.3d at 195 (Silberman, J., concurring) (stating that a party seeking permissive intervention must establish standing). Thus, under existing authority, the court's conclusion as to standing in the intervention-as-of-right context does not automatically preclude permissive intervention. This court need not, however, take a position on the open question of the standing requirements for permissive intervention because the court exercises its broad discretion to deny Proposed Intervenors' request for party status on other grounds.

Permissive intervention, as its name suggests, is a matter of discretion. Rule 24(b) provides, "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." FED. R. CIV. P. 24(b)(1). "In exercising its discretion, the court must consider whether the intervention will unduly

delay or prejudice the adjudication of the original parties' rights." *Id.* The Circuit has recognized that "permissive intervention is an inherently discretionary enterprise." *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998). Indeed, "[d]istrict courts have the discretion . . . to deny a motion for permissive intervention even if the movant established an independent jurisdictional basis, submitted a timely motion, and advanced a claim or defense that shares a common question with the main action." *Id.* at 1048. Thus, district courts have "wide latitude" in evaluating permissive intervention requests. *Id.*

Here, the court finds that Proposed Intervenors' participation as parties in this manner is not essential for the "just and equitable adjudication of the legal question[s] presented." *Sierra Club v. McCarthy*, 308 F.R.D. 9, 12 (D.D.C. 2015) (citation and internal quotation marks omitted); *see* Mot. to Intervene at 17 (stating that "Public Health Intervenors intend to limit their briefing to avoid duplicative arguments"). Proposed Intervenors seek intervention primarily to support only one of the four grounds on which Plaintiffs presently challenge the Rule—the warning requirements. Proposed Intervenors have not given the court sufficient reason to believe that Defendants will not defend those requirements to the fullest. If anything, Defendants' decision *not* to reconsider or delay implementation of the warning requirements, when they did so for other portions of the Rule initially contested by Plaintiffs, strongly suggests that Defendants will aggressively defend those requirements. Proposed Intervenors will have ample opportunity to do the same, as the court already granted their motion to join these proceedings as amicus curiae. *See* Order, ECF No. 30. Proposed Intervenors' views, therefore, will receive a full hearing and, to the extent they believe Defendants do not adequately defend the warning requirements or any other challenged aspect of the Rule, they have a means to make that position known to the court.

Accordingly, in the exercise of its discretion, the court declines to permit Proposed Intervenors to permissively intervene under Rule 24(b).

## V. CONCLUSION

Thus, for the reasons stated, Proposed Intervenors' Motion to Intervene is denied. A separate Order accompanies this Memorandum Opinion.

Dated: October 16, 2017

Amit P. Mehta
United States District Judge